# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BRUCE NAGY,                      )
                                 )
           Plaintiff,            )
                                 )   Civil Action No. 07-123 Erie
                                 )
           v.                    )
                                 )
MICHAEL J. ASTRUE,               )
Commissioner of Social Security, )
                                 )
           Defendant.            )

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., J.

Plaintiff, Bruce Nagy, commenced the instant action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security denying his claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401 *et seq,* and § 1381 *et seq.* Nagy filed applications for DIB and SSI on June 25, 2003, alleging disability since July 7, 2000 due to depression, herniated disc disease, cervical spine disease and chronic obstructive pulmonary disease (Administrative Record, hereinafter "AR", 404-406; 413; 575-576).[1] His applications were denied and he requested a hearing before an administrative law judge ("ALJ") (AR 388-393; 579-582). A hearing was held before an administrative law judge ("ALJ") on April 13, 2005 (AR 592-612). Following this hearing, the ALJ found that Nagy was not entitled to a period of disability, DIB or SSI under the Act (AR 19-28). His request for review by the Appeals Council was denied (AR 9-12), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). The instant action challenges the ALJ's decision. Presently pending before the Court are cross-motions for summary judgment. For the reasons set forth below, we will grant Defendant's motion and deny Plaintiff's motion.

---

[1] This is Nagy's second application for benefits. Nagy previously filed an application for DIB on March 22, 2001 (AR 19; 69-71). This application was denied at the administrative level and by the ALJ in a decision dated May 21, 2003 (AR 19; 367-377). The Appeals Council denied review on February 13, 2004 (AR 19).

# I. BACKGROUND

Nagy was born on August 19, 1960 and was forty-four years old at the time of the hearing before the ALJ (AR 20). He is a high school graduate with past relevant work experience as a coal miner, mold injection operator, maintenance person, construction laborer and roofer (AR 86, 91, 607-608). The medical evidence reveals that Nagy was treated for the following physical impairments: neck, ankle and back pain; chronic obstructive pulmonary disease; and Hepatitis C (AR 133; 148; 172; 181; 197-198; 212-213; 233; 312-366; 442-496).

In February 2001 a cervical spine x-ray was reported as normal and a CAT scan of his head was unremarkable (AR 144). In March 2001 a cervical spine MRI revealed a minimal disc bulge at C3-4 but was otherwise normal (AR 162-163). In June 2001 Nagy exhibited a full range of motion on physical examination with only minimal pain noted on extreme motion (AR 233). Camille Garner, M.D., reported Nagy had no strength limitations on physical examination in July 2001 (AR 198).

In February 2002 a lumbar MRI showed a right paracentral disc herniation at the L4-5 level and disc space narrowing with degenerative endplate change at L5-S1 (AR 346). On March 16, 2002, Nagy presented at the Metro Health emergency room and reported that he had injured his back lifting concrete (AR 457). Emergency room records noted that he was a known "drug/pain med seeker" who had previously been treated at two different hospital emergency rooms on March 7, 2002 and March 10, 2002 for back pain (AR 457).[2] He was prescribed Toradol and advised to follow up with his primary care physician and a neurosurgeon (AR 457). In July 2002, Nagy was discharged from treatment at the Saint Vincent Family Medicine Center due to his belligerent behavior when denied a narcotic prescription (AR 307-308). In September 2002, Nagy was treated at the emergency room for complaints of ankle pain but x-rays revealed no recent fractures (AR 447; 451). In November 2002 he was prescribed Ultracet for complaints of back pain (AR 442).

On August 20, 2003, Nagy was examined by Valerie S. Gilreath III, D.O. (509-515). Dr.

---

[2]Nagy was prescribed various pain medications for his complaints of pain, and was continuously reminded of the need to limit his use of narcotics pursuant to a chronic pain contract and cautioned on his inappropriate use of narcotics (AR 236; 327).

Gilreath opined that Nagy needed an aggressive doctor to help get his pain under control, reduce his narcotic addiction and "return him back to the workforce as soon as possible" (AR 514). Dr. Gilreath was of the opinion that there were plenty of opportunities for Nagy to work (i.e., "as a greeter for Wal-Mart" or "in the union ... teaching other individuals how to do roofing and safety procedures appropriately") until he "straightened out" (AR 514).

In addition to his alleged physical impairments, Nagy also underwent treatment for depression (AR 290-303; 498-507; 520-522). In March 2001, he was evaluated by Booker T. Evans, M.D., and relayed a history of past psychiatric hospitalizations for depression and/or suicide attempts (AR 191). On mental status examination, Dr. Evans reported that Nagy's thoughts were organized and relevant, his judgment and insight were good, although he felt helpless and hopeless and had low self esteem (AR 193-194). He was diagnosed with major depression, severe, recurrent without psychosis and seasonal affective disorder; personality disorder not otherwise specified with significant borderline and anti-social traits; and assigned a Global Assessment of Functioning ("GAF") score of 65 (AR 194).[3] Dr. Evans prescribed Prozac, Trazodone and Klonopin, and Nagy began mental health treatment with Community Integration, Inc. (AR 194; 301). Community Integration treatment notes reflect that on the majority of his visits, Nagy's appearance, behavior, mood/affect and cognition were within normal limits and his GAF scores ranged from 45 to 65 (AR 290; 501-502; 505-508; 522).[4]

---

[3]The GAF score considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. It represents "the clinician's judgment of the individual's overall level of functioning." *See Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 32 (4th ed. 2000). Scores between 61 and 70 indicate "mild symptoms (e.g., depressed mood and mild insomnia) OR any some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id*. at 34.

[4]Scores between 41 and 50 indicate "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* Scores between 51 and 60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.*

3

In October 2001, Nagy was evaluated by Byron E. Hillin, M.D. (AR 253-258). Nagy reported that he attended regular classes in school performing average work, was able to read and write and denied any learning difficulties (AR 255). On mental status examination, Dr. Hillin reported that his affect was normal, his thoughts were well organized and goal directed, he had average intelligence and his memory was intact (AR 256-257). Dr. Hillin found that Nagy's attention and concentration were fair, and his ability to concentrate would fluctuate with depressive symptoms (AR 257-258). He was able to engage in daily activities and would be able to relate fairly with others (AR 257-258). Dr. Hillin opined that he could perform moderately complex tasks but that his ability to work was dependent upon stabilization of his depression (AR 258).

On October 24, 2003, Nagy was evaluated by Michael Schwabenbaur, Ph.D (AR 523-528). Dr. Schwabenbaur reported that Nagy had difficulty remaining on topic and frequently rambled, displayed disorganized speech and exhibited a labile affect (AR 525). He had difficulty maintaining concentration and required frequent redirection (AR 525). His thought process however, was reported as logical and coherent and he demonstrated average intelligence (AR 526). Dr. Schwabenbaur assigned Nagy a GAF score of 55, and opined that could understand, remember and carry out short, simple instructions; remember detailed instructions, but would likely exercise poor judgment in completing simple work-related decisions; and was moderately impaired in his ability to relate to the public, supervisors and co-workers (AR 526).

Safe Harbor Behavioral Health treatment notes reveal that between December 2003 and April 2005 Nagy's appearance, behavior, mood/affect and cognition were reported as within normal limits for the majority of his visits and his GAF scores ranged from 45 to 50 (AR 550-574). At his last visit on April 12, 2005 Nagy reported that he had been doing "great" the past several months and Dr. Walton reported his affect as bright (AR 550). Because he reportedly continued to do well, Dr. Walton continued to taper his medications (AR 550).

Nagy and Charles Cohen, a vocational expert, testified at the hearing held by the ALJ on April 13, 2005 (AR 592-612). Nagy testified that he was a high school graduate and relayed his past work experience (AR 597-600). He described the circumstances surrounding his ankle injury, back injury and neck injury (AR 600-603). To alleviate his neck and back pain, Nagy

testified that he slept on plywood with a rolled towel under his neck and went through 50 Extra Strength Tylenol every two to three days (AR 601-602). He claimed he was prescribed a TENS unit but his medical assistance would not cover the cost (AR 604). Nagy testified that his Hepatitis C was not symptomatic (AR 605). He further testified to suffering from shortness of breath daily (AR 605). He claimed he was able to walk approximately four blocks and lift up to twenty pounds (AR 606). Nagy further testified that he suffered from depression and seasonal affective disorder for which he was prescribed Prozac, Trazodone and Neurontin (AR 603).

The ALJ asked the vocational expert to assume an individual of the same age, education and work experience as Nagy, who was limited to simple, non-detailed instructions, needed to avoid direct interaction with the general public and changes in the work setting, needed to avoid decision-making, and had the ability to lift twenty pounds occasionally and ten pounds frequently, with the need for a sit/stand option and the ability to engage in postural activities on an occasional basis only (AR 608). The vocational expert testified that such an individual could not perform Nagy's past work, but could perform the following light jobs: packer, assembler and inspector (AR 608). The vocational expert further testified that added limitations of the need to avoid intensive supervision and close interaction with co-workers did not eliminate the jobs identified (AR 608).

Following the hearing, the ALJ issued a written decision which found that Nagy was not entitled to a period of disability, DIB or SSI within the meaning of the Social Security Act (AR 19-28). His request for an appeal with the Appeals Council was denied rendering the ALJ's decision the final decision of the Commissioner (AR 9-12). He subsequently filed this action.

## II. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *see Richardson v. Parales,* 402 U.S. 389, 401 (1971). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson,* 402 U.S. at 401; *Jesurum v. Secretary of the*

5

*United States Dept. of Health and Human Servs.,* 48 F.3d 114, 117 (3d Cir. 1995).

### III. DISCUSSION

Title II of the Social Security Act provides for the payment of disability insurance benefits to those who have contributed to the program and who have become so disabled that they are unable to engage in any substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). Title XVI of the Act establishes that SSI benefits are payable to those individuals who are similarly disabled and whose income and resources fall below designated levels. 42 U.S.C. § 1382(a). A person who does not have insured status under Title II may nevertheless receive benefits under Title XVI. *Compare* 42 U.S.C. § 423(a)(1) *with* 42 U.S.C. § 1382(a). In order to be entitled to DIB under Title II, a claimant must additionally establish that his disability existed before the expiration of his insured status. 42 U.S.C. § 423(a), (c). The ALJ found that Nagy met the disability insured status requirements of the date of his decision (AR 20). SSI does not have an insured status requirement.

To be eligible for DIB or SSI, the burden is on the claimant to show that he has a medically determinable physical or mental impairment (or a combination of such impairments) which is so severe that he is unable to pursue substantial gainful employment currently existing in the national economy. 42 U.S.C. § 423(d)(1)(A) and (d)(2)(A). The Commissioner uses a five-step sequential evaluation process to determine whether a person is disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The process requires the Commissioner to consider, in sequence, whether a claimant: (1) is currently employed; (2) has a severe impairment; (3) has an impairment which meets or equals the requirements of a listed impairment; (4) can perform past relevant work; and (5) if not, whether the claimant is able to perform other work, in view of his age, education, and work experience. 20 C.F.R. §§ 404.1520, 416.920(b)-(f); *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985).

In this case, the ALJ found that Nagy was not disabled at the fifth step of the sequential process because he had the residual functional capacity to perform work at the light level provided that he was afforded a sit/stand option; and provided he was limited to no more than simple instructions with no changes in the work setting: no direct interaction with the general public, intensive supervision or close interaction with co-workers; no concentrated exposure to

environmental hazards; and only occasional postural movements (AR 24). Nagy does not challenge the ALJ's RFC finding, nor does he challenge the ALJ's remaining findings pursuant to the sequential evaluation process. Rather, Nagy argues that his waiver of counsel was not knowing and voluntary and that his claim was prejudiced as a result. Having carefully reviewed Nagy's argument, we conclude that it is without merit.

While there is no constitutional right to counsel at a social security disability hearing, a claimant does have a statutory and regulatory right to counsel at such hearing. *See* 42 U.S.C. § 406; 20 C.F.R. §§ 404.1700-404.1707; *see also Phifer v. Commissioner of Social Security*, 84 Fed Appx. 189, 190 (3rd Cir. 2003). The claimant must be provided with notice of his right to counsel and can waive this right as long as such waiver is knowing and intelligent. *Id*. A claimant cannot knowingly and intelligently waive his statutory right to counsel if he is not adequately informed of it. *Curry v. Barnhart*, 2006 WL 1192920 at * 2 (E.D.Pa. 2006). Nevertheless, the mere lack of counsel does not dictate remand. *Livingston v. Califano*, 614 F.2d 342, 345 (3rd Cir. 1980). Remand is appropriate only if "it is clear that the lack of counsel prejudiced the claimant or that the administrative proceeding was marked by unfairness due to the lack of counsel[.]" *Id.*

Here, we first observe that when Nagy was informed of the agency's initial decision to deny benefits on November 24, 2003, he was informed in writing of his right to representation (AR 391). He was specifically informed that: (1) groups were available that could help him find a lawyer or provide free legal services if he qualified; (2) there were lawyers that did not charge unless he won his appeal and his local Social Security office had a list of groups that could help him; and (3) attorney fees were limited to 25 percent of past due benefits and required approval (AR 391). When Nagy requested an administrative hearing before the ALJ, he was again informed in writing of his right to be represented at the hearing and that his local Social Security office could provide him with a list of legal referral and service organizations (AR 392).

On April 13, 2005, the day of the administrative hearing, Nagy executed a waiver form, acknowledging that he had been advised both orally and in writing of his right to be represented at the hearing by an attorney or other person, and that he could request postponement of the hearing in order to secure representation (AR 591). Nagy further represented that although he

7

had attempted to contact an attorney or representative, he decided "of my own free will to waive my right to representation and choose to have my hearing now without a representative" (AR 591).

In addition to the prior written notices and the explicit written waiver, the ALJ confirmed that Nagy was present without representation at the administrative hearing and engaged in the following colloquy:

> ALJ: This is a hearing involving the claim of Mr. Bruce R. Nagy for a Period of Disability and Disability Insurance Benefits and Supplemental Security Income. And we were saying before we went on the record, if you want to postpone the hearing to get a representative we can do that. It's strictly up to you.
>
> CLMT: Well, the thing of it is is finding a good attorney that will, I thought I had a good attorney and he's disappeared. I don't know where he's at.
>
> ALJ: Okay. But do you want to go ahead with the hearing today or not?
>
> CLMT: Yeah, let's go with the hearing. I mean – (AR 594).

The evidence of record clearly demonstrates that Nagy's waiver of representation was knowingly and intelligently made. Nagy received written notification on several occasions of his right to secure representation. While there is evidence in the record that Nagy suffers from depression and seasonal affective disorder, the record is devoid of any evidence of an intellectual impairment that would render his written waiver invalid. We are satisfied that Nagy had full knowledge of his right to representation at the hearing yet knowingly declined such right. *See e.g., Boyd v. Barnhart*, 98 Fed.Appx. 146, 147 (3rd Cir. 2004) (finding claimant's waiver of her right to representation was voluntary where she was literate, had been previously notified of her right to representation, and the ALJ offered to continue the hearing); *Phifer v. Barnhart,* 84 Fed.Appx. 189, 191 (3rd Cir. 2003) (effective waiver found where claimant received two previous notices of his right to legal representation and ALJ confirmed on the record that the claimant wished to proceed without an attorney); *Glenn v. Commissioner of Social Security,* 67 Fed.Appx. 715, 718 (3rd Cir. 2003) (mother's waiver of counsel effective where she was notified of the right to counsel in notices mailed to her prior to hearing and again by the ALJ at the start of the

hearing).

Furthermore, there is no evidence to suggest that Nagy was prejudiced or that the hearing was fundamentally unfair due to his lack of counsel. Instead, the record demonstrates that the ALJ discharged his duty in exercising special care in assisting Nagy in developing the administrative record. *Reefer v. Barnhart*, 326 F.3d 376, 380 (3rd Cir. 2003) (an ALJ "owes a duty to a *pro se* claimant to help him or her develop the administrative record"). The ALJ first carefully explained to Nagy how the hearing would proceed (AR 595). He then thoroughly questioned Nagy concerning his: educational background and prior work history (AR 597-600); herniated disc and back pain, as well as pain relieving measures taken (AR 601-602); degenerative disc disease in his cervical spine and medications taken (AR 602-603); depression and seasonal affective disorder and treatment with a psychiatrist (AR 603-604); Hepatitis C and shortness of breath (AR 605); and any limitations he had relative to standing, walking and lifting (AR 605-606). *Compare Brubaker v. Barnhart,* 2005 WL 3557925 at * 2 (E.D.Pa. 2005) (affirming where ALJ elicited testimony concerning the claimant's activities, symptoms and functional limitations) *with Gauthney v. Shalala*, 890 F. Supp. 401, 410 (E.D.Pa. 1995) (remanding where the ALJ failed to elicit testimony as to claimant's capabilities).

In addition, the ALJ questioned Nagy as to the completeness of the medical evidence (AR 595). When Nagy responded that the record was incomplete with respect to his alleged mental impairments, the ALJ offered, on several occasions, to provide Nagy with an envelope in which to forward the records (AR 596; 606). The ALJ volunteered (three times) that he would also independently attempt to secure the more recent records on Nagy's behalf (AR 596; 606; 611). The record was held open for a period of time and the ALJ ultimately obtained the medical records relative to Nagy's mental impairments (AR 22; 550-574).

Nagy claims that he suffered prejudice because he did not understand the role of the vocational expert at the hearing and the need to question him. *Plaintiff's Brief* p. 14. To the contrary, Nagy did not manifest any misunderstanding with respect to the nature of the hearing overall or the vocational expert's role. Nagy was familiar with the administrative process, having previously participated in a prior disability hearing during which he was represented by counsel (AR 370-377). Here, the record reflects that the ALJ noted the presence of the vocational expert

9

and asked him to explain his qualifications in more detail since Nagy was unrepresented (AR 607). The vocational expert described his background and areas of specialty for Nagy (607). The ALJ propounded a series of questions to the vocational expert based upon the medical evidence and Nagy's testimony. He first asked the vocational expert to assume an individual the same age as Nagy, who had the same education and past work experience (AR 608). He asked the vocational expert to further assume that the individual was limited to simple, non-detailed instructions, needed to avoid direct interaction with the general public and changes in the work setting, needed to avoid decision-making and had the ability to lift twenty pounds occasionally and ten pounds frequently, with the need for a sit/stand option, and the ability to engage in postural activities on an occasional basis only (AR 608).

The vocational expert testified that the individual would not be able to perform Nagy's past work, but could perform jobs in light packing, light assembly and light inspection (AR 608). The vocational expert further testified that these jobs would not be eliminated with the added limitations of the need to avoid intensive supervision and close interaction with co-workers (AR 608). Such an individual would not however, be able to perform the identified jobs if the hypothetical person should avoid rapid movements with the hands, but could perform the alternative job of night security guard (AR 608-609). The ALJ further narrowed the hypothetical question to an individual who could sit for one hour at a time, but could only stand for one half hour (AR 609). The vocational expert testified that the security guard job would be eliminated because it required an individual to be on his feet for approximately 45 minutes at a time (AR 609). Finally, the ALJ asked whether there would be jobs available if the hypothetical person were limited to a total of one hour of sitting and one hour of standing per day, and the expert confirmed there would be no work (AR 609). The ALJ then gave Nagy the opportunity to question the vocational expert, but he declined (AR 610).

The ALJ posed not only a hypothetical question based upon his RFC finding, but he also propounded a series of hypothetical questions that were more restrictive than his RFC finding. The more restrictive hypothetical questions are usually posed by a claimant's counsel base upon the claimant's subjective complaints. *Compare Curry v. Barnhart,* 1192920 At *4 (E.D.Pa. 2006) (ALJ posed only one hypothetical question to the vocational expert with no follow-up

10

questions and an attorney would have modified the hypothetical with additional limitations). Because the ALJ functionally assisted Nagy with regard to the vocational expert's testimony, we find no prejudice occurred.[5]

### IV. Conclusion

Based upon the foregoing reasons, the Commissioner's final decision will be affirmed. An appropriate Order follows.

---

[5]We further reject Nagy's claim that the ALJ erred in denying a supplemental hearing "by not acting in an excess of caution." *Plaintiff's Brief* p. 13. Given the knowing and intelligent waiver of counsel and the full and fair development of the record discussed above, we find no abuse of discretion in this regard.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BRUCE NAGY, )
)
        Plaintiff, )
) Civil Action No. 07-123 Erie
)
        v. )
)
MICHAEL J. ASTRUE, )
Commissioner of Social Security, )
)
        Defendant. )

## ORDER

AND NOW, this 9th day of April, 2008, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Plaintiff's Motion for Summary Judgment [Doc. No. 8] is DENIED, and the Defendant's Motion for Summary Judgment [Doc. No. 15] is GRANTED. JUDGMENT is hereby entered in favor of Defendant, Michael J. Astrue, Commissioner of Social Security, and against Plaintiff, Bruce Nagy. The clerk is directed to mark the case closed.

                                                  s/ Sean J. McLaughlin
                                                  United States District Judge

cm: All parties of record.